## ILLINOIS CENTRAL RAILROAD COMPANY
## v.
## BELFORD SLATER, ADM'R.

*Personal Injuries—Railroads—Collision at Highway Crossing—Death of Child—Action for Damages—Questions for Jury—Negligence of Parent —Evidence—*Res Gestæ.

1. It seems that a failure to look in the direction from which a train is expected, upon approaching a railroad crossing, if such train would be visible to a person so looking, will defeat a recovery for injuries suffered by him from the train in question, although the bell was not rung nor the whistle sounded.

2. It is not negligence in a parent to send minor sons of nine and thirteen years with a gentle team upon an errand which requires them to cross a railroad track at an established crossing.

3. Evidence as to the speed of the train at the time of the accident is admissible as part of the *res gestæ.*

4. The question of damages for causing the death of a child rests in the sound discretion of the jury. In the case presented, a verdict for $1,000 is sustained.

5. Evidence as to the financial standing of the father, who sues as administrator for the use of the next of kin, is inadmissible.

[Opinion filed July 16, 1888.]

APPEAL from the Circuit Court of Ogle County; the Hon. C. W. UPTON, Judge, presiding.

Messrs. W. & W. D. BARGE, for appellant.

Messrs. James H. Cartwright and J. W. Allaben, for appellee.

C. B. Smith, J.    Arthur B. Slater and Lewis Slater, broth-
ers, and the children of Belford Slater, were both struck and
killed on the 24th of August, 1886, by a locomotive engine
drawing a passenger train on appellant's road near Polo at
Brand's crossing.    Arthur was about nine years old and Lewis
about thirteen when they were killed.    On the morning of
the day of the accident, Belford Slater, the father, sent the
two boys to Polo, something over a mile distant from home,
with a team and wagon, to get a barrel of buttermilk from the
creamery.    Arthur had been going to school, but on that day
had a sore foot and could not go and was allowed to accom-
pany his brother Lewis on the errand to the village.    They
did the errand and about eleven o'clock were returning home
and reached Brand's crossing at about the time the passenger
train was due at the crossing and in crossing the track the
wagon in which the boys were riding was struck by the
engine drawing the train and the boys both instantly killed.
This suit is brought by the father as administrator of Arthur
B. Slater for the use of the next of kin.

There are three counts in the declaration.    The first
charges the defendant with negligently running its train at a
high and dangerous rate of speed and with failing to keep a
proper watch for persons about to cross the track and with
failing to give such signal as would warn persons of the
approach of the train and with a failure to stop or to endeavor
to stop the train after the danger was apparent.    The second
count charges negligence in doing or not doing some one of
these things named in the first count.

The third count charges the negligence of the company to
consist in not ringing a bell of thirty pounds weight or blowing
a whistle at least eighty rods before reaching the crossing and
in not keeping the bell ringing or the whistle blowing contin-
uously until the crossing was reached, and that by reason of
such failure the deceased, in the exercise of due care, failed to
hear or see the approaching train, and without his fault was

killed. All the counts aver the deceased was in the exercise of due care and caution.

The plea was the general issue. The only controverted question of fact was as to whether defendant and deceased, one or both, were guilty of negligence, and the degree of that negligence. The proof shows or tends to show that the train was perhaps five minutes late at the crossing and that it was running at the rate of speed of about forty miles an hour at the time. There is a good deal of conflict in the testimony as to what, if any, obstructions there were in the immediate vicinity of the crossing in the direction from which the train was coming which would or would not obstruct the view of persons approaching the crossing, so as to prevent a person on the watch (using care) to see the approaching train. According to appellee's witnesses the obstructions were many and serious and would be likely to prevent any person seeing the approach of the train until they were on or very near the right of way. According to appellant's witnesses any person using ordinary care would have no trouble, if he looked, to see the approaching train at least two miles. The evidence satisfies us that there were a good many obstructions along the sides of the right of way and near it, consisting of trees and osage and willow hedge, orchards, cribs and sheds, such as to seriously interrupt the vision. The accident occurred, too, at a time when the trees were in full leaf. The train was running on a down grade until very near the crossing and making less noise from the escape of steam and the exhaust and labor of the engine than it would on a level or up grade. Appellant has taken great pains and called many witnesses to satisfy the jury and court that the obstructions were not such as to obstruct the view of a careful and watchful person. Many photographs have been taken at different positions on the wagon road and showing a view of the track and train at different points above the crossing in the direction from which the train came on the day of the accident. Witnesses also testify that, standing at different points on the road near the crossing where the boy lost his life and over which the wagon passed immediately prior to the accident, they could

see the track for nearly or quite two miles. The proof dis-
closes that many of these photographs and these observations
were taken in December when the foliage was all gone. The
camera, also, was much lower than the boys sitting on the top
of the wagon and would be very likely to miss obstructions
among trees which would meet the eye of a person sitting on
top of a wagon when the trees were in full leaf.

What the nature and extent of these obstructions were and
how much, if any, they would interrupt the view of persons
approaching the track, was one of the controverted facts in
the case and seems to have been fairly submitted to the jury.
That these obstructions existed, cutting off the view from the
road, receives support from the engineer himself. He swears
that he was on his seat at his proper place and looking for-
ward as he approached the crossing; that the windows in the
cab were open, that he blew the whistle at the whistling post
but saw no teams until he was within twenty-five or thirty
rods of the team, and that the team was then just on the right
of way about fifty feet from the track. The opportunity for
the engineer to see the approaching team from his elevated
seat was fully as good as that of the boys in the wagon to see
the approaching train. Approaching the track was one of
the controverted facts in the case and was fairly and fully
submitted to the jury. If there were sufficient openings in
the direction from which the train was coming to enable the
deceased to see the train if he had looked on approaching the
track, and he failed to look, then such failure to look would
be such negligence as would defeat a recovery, and in that
view of the case it would make no difference whether the
defendant rang a bell or sounded a whistle or not; but if, on
the contrary, these obstructions were of such a character as
to prevent the deceased and his brother, in the exercise of
proper and reasonable care and caution, from seeing the train
coming in time to save themselves, then it becomes a very im-
portant and material question of fact whether the defendant
rang the bell or sounded the whistle as required by law, or for
such reasonable length of time as would give persons approach-
ing the track warning of danger so that they might keep off
the crossing until the train passed.

As to whether or not the defendant rang the bell or sounded the whistle for the distance of eighty rods, there is also great contradiction in the record. All admit that the danger signal was given by the engineer shortly before striking the wagon. Many witnesses swear that, being near enough to hear the bell or the sound of the whistle, they heard nothing until the danger signal was sounded close to the crossing. On the contrary, many, and perhaps more, witnesses testify for the defendant, that the whistle was sounded for the crossing, and that the bell was rung until the crossing was reached. The proof tends to show (and it is not contradicted) that these boys were accustomed to driving and handling these and other horses and driving the teams by themselves, and that they were competent to do so under ordinary circumstances, and that this was a gentle and quiet team. We do not think the father was guilty of such negligence (even if any want of care can be attributed to him) in allowing his sons to go on the errand on that fatal day as would prevent his recovery on that ground. Children, if not too young, have a right to go on the public highways, and parents may send them upon reasonable errands without forfeiting their right to the ordinary protection which the law guarantees to adults under like circumstances.

After a careful consideration of the evidence in this record, we can not say that the verdict of the jury is so manifestly against the weight of the evidence as to require our intervention to set it aside.

We can see nothing in the record which would probably produce a different result on another trial. If, under the facts, appellee was entitled to recover, the amount of the verdict is not unreasonable. We think there is nothing in the objection that the damages are excessive. The Supreme Court of this State have decided so often that the question of damages in cases of this kind rests in the sound discretion and judgment of the jury that we do not deem it necessary to discuss it or cite authorities in its support.

It is also objected that the court erred in allowing the speed of the train to be shown. This was clearly right. It was a part of the *res gestæ.*

It is also objected that the court erred in refusing to allow appellant to prove the financial condition of appellee. We are unable to see the force of this objection, either for the purpose of showing a want of care on the part of appellee or for the purpose of mitigating damages or defeating the action.

The next objection urged is that the court erred in giving and refusing instructions. Six instructions were asked and given on motion of the plaintiff. We think they fully and correctly state the law of the case and are not open to the criticism made against them. The appellant submitted and asked the court to give thirty-four instructions to the jury on its part. The court refused nine, modified three, and gave the remaining twenty-two as requested. In these twenty-two instructions given as asked, and the three given as modified, we think every legal right of the appellant was fully and clearly given to the jury and that it can have no right to complain on the ground of instruction. We see no error in this record and the judgment is affirmed.

*Judgment affirmed.*

Judge UPTON, having tried this case in the court below, took no part in the decision.